United States District Court
Southern District of Texas
**ENTERED**
July 18, 2022
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE IMPERIAL PETROLEUM RECOVERY CORPORATION | § § § | |
| Debtor. | § § | |
| | § | |
| DON B. CARMICHAEL, *et al.*, | § § | CIVIL ACTION NO. H-21-2904 |
| | § | ADVERSARY CASE NO. 14-03375 |
| | § | BANKRUPTCY CASE NO. 13-30466 |
| Plaintiffs, | § § | |
| VS. | § § | |
| THOMAS BALKE, *et al.*, | § § | |
| | § | |
| Appellees. | § | |

**MEMORANDUM OPINION AND ORDER**

This is the latest in a series of bankruptcy cross-appeals growing out of a prolonged business dispute between the appellants and cross-appellees, Don Carmichael, KK & PK Family LP, Barry D. Winston, and Gary Emmott (together, "Carmichael"), and the appellees and cross-appellants, Thomas Balke and TEBJES (together, "Balke"), and Ultrawave Technology for Emulsion Control ("Ultratec"). The bankruptcy court began the last of its opinions—the subject of these cross appeals—by citing Bleak House and telling the parties that their dispute needed to end.[1] This court emphatically agrees.[2]

---

[1] "[This] suit has, in course of time, become so complicated that no man alive knows what it means. . . . [S]till [it] drags its dreary length before the court, perennially hopeless." Charles Dickens, *Bleak House*, in 1 WORKS OF CHARLES DICKENS 4–5 (1891).

[2] The court provides citations to the opinions of the bankruptcy judges that correspond with the docket entry numbers in the adversary proceeding below. *In re Imperial Petroleum Recovery Corp.*, No. 13-30466, 2021 WL 933989 (Bankr. S.D. Tex. Mar. 11, 2021), *appeal dismissed sub nom. Matter of Imperial Petroleum Recovery Corp.*, No. 21-20228, 2021 WL 5105104 (5th Cir. July 9, 2021).

The issues in this case should not have resulted in 755 docket entries in the underlying adversary proceeding, and ten years of litigation in state and federal courts. The issues were made to appear more complicated by the parties' readiness to file "emergency" motions (particularly inappropriate when the court was dealing with genuine emergencies resulting from a global pandemic) and to endlessly challenge what is or is not in the record.

Carmichael was a group of investors in Imperial Petroleum Recovery Corporation, which was the debtor in the main bankruptcy proceeding. Imperial stored property at Basic Equipment, which Balke owned. The dispute centers on whether Balke owes Carmichael for one or two microwave separate technology (MST) units, and what those units were worth. Carmichael challenges the bankruptcy court's March 2021 and August 2021 Memorandum Opinions finding that Balke owed, and turned over, the single MST 1000 unit that existed, as well as some leftover parts. (Docket Entry Nos. 718, 763). The bankruptcy court concluded that Balke did not keep any of the bankruptcy estate's property that had been assigned to Carmichael, and that although Balke had violated the automatic stay by failing to return all the property in intact shape, Carmichael was entitled to only $4,000 in damages, an attorney's fee award of $40,968.19, and costs of $50,794.96. (Docket Entry No. 718). Carmichael insists that it suffered far more in damages and is also entitled to far more in fees for the hundreds of hours its lawyers have spent pursuing Balke in the bankruptcy court and in this court. Balke contends that the bankruptcy court erred in finding any damages from the violation of the automatic stay that occurred when Balke dissembled the MST 1000 unit before returning it to Carmichael, and in awarding any damages or fees.

Based on a careful review of the bankruptcy court's opinions, the parties' briefs, the record, and the applicable law, the court finds that the bankruptcy court was correct in its March 2021 and August 2021 Memorandum Opinions, and upholds the judgment awarding Carmichael $4,000 in

damages, $40,968.19 in fees, and $50,794.96 in costs.  The cross appeals are dismissed, with prejudice, and with a plea to both parties and their lawyers to end this litigation.  Enough.

## I.      Factual and Procedural Background

Carmichael invested in, and loaned money to, Imperial Petroleum Recovery Corporation, which built oil field machines based on patented Microwave Separation Technology.  (Docket Entry No. 16 at 12; ROA.0024937).  This technology is used to separate oil from mud, so that the oil can be sold to petroleum producers.  (ROA.0023855).  In 2011, before Imperial's bankruptcy, Imperial and Balke, representing Basic Equipment, entered a Memorandum of Understanding, which required Basic to refurbish two MST 1000 units for Imperial.  (ROA.0023855–58).  The refurbishment required Imperial to provide Basic with access to technology and equipment for use in the refurbishment.  (Docket Entry No. 693 at 3; ROA.0023855; ROA.31375 at 17).  When the Memorandum of Understanding was executed in 2011, Imperial had provided Basic with one MST 1000 Unit, referred to as the Demo Unit, and spare parts to use in refurbishing the unit.  (ROA.31375 at 16–20).  A separate MST 150 Unit, referred to as the Brazil Unit, was delivered to Basic in 2012, after a Brazilian company had finished using it.  (ROA.24835; 24906).  Basic used the Brazil Unit to provide parts for the Demo Unit, which was operational for demonstration purposes, in August 2012.  (ROA.036969; ROA.24836–37).

In 2012, Springer, the president and CEO of Imperial, and Imperial sued Carmichael in state court, alleging that the group breached its fiduciary duty to Imperial and stole Imperial's assets.  (ROA.0023934).  Carmichael in turn sued Imperial to collect on the promissory notes it had executed to loan money to, and invest in, Imperial.  (ROA.0023934).  Carmichael filed an involuntary bankruptcy petition against Imperial in 2013.  (Docket Entry No. 242 at 4).  The state court cases were removed to adversary proceedings in the bankruptcy court, and Springer initiated

a third adversary proceeding against Carmichael.  (ROA.0023934–36).  In March 2014, the Chapter 11 bankruptcy was converted to a Chapter 7 bankruptcy.  (Docket Entry No. 242 at 5).  In July 2014, the court lifted the stay to allow the Chapter 7 Trustee to assign Carmichael certain Imperial assets to foreclose on the note. (ROA.0024006; Docket Entry No. 693 at 4).  The assets included the MST equipment that is the basis of this dispute.

During the bankruptcy proceedings, Imperial's property was moved to an industrial complex partially owned by Balke.  (Docket Entry No. 21 at 17; ROA. 24336).  In August 2014, Carmichael asked Balke to move Imperial's remaining assets to Carmichael's property. (ROA.0024013–21).  Carmichael alleges that Balke did not deliver all the equipment it had, including a second MST 1000 unit.  (Docket Entry No. 16 at 21).  Carmichael alleges that instead of two refurbished MST 1000 units, Balke provided one gutted and dismantled MST 1000 unit and some leftover spare parts.  (Docket Entry No. 16 at 19).  Carmichael alleges that Balke was planning to form a new company, Ultratec, to compete with Imperial Petroleum by stealing and using the MST technology. (Docket Entry No. 16 at 15–16).[3]  Balke argues that the evidence, including Carmichael's work orders, shows that Ultratec had separately purchased the equipment needed to construct an MST 1000 prototype, and that Carmichael had no right to that equipment. (Docket Entry No. 23 at 21).

The issues in the adversary proceeding were whether Imperial's bankruptcy estate had one or two operational MST units; whether Balke intentionally violated the stay by failing to turn over all the MST equipment Carmichael had a right to obtain; whether that violation caused Carmichael damages; and if so, the amount of damages, fees, and costs that should be awarded.  But added to

---

[3]  Any such plans failed; Ultratec has been defunct for some time.  (ROA.0026646).

4

these relatively straightforward issues, the parties created what Judge Isgur aptly characterized as a "procedural morass."  (Docket Entry No. 718 at 2).

The first bankruptcy judge assigned to the case, Judge Bohm, held several hearings and heard testimony.  Judge Bohm entered lengthy findings and conclusions, ultimately ruling in favor of Carmichael in January 2018.  (Docket Entry Nos. 242, 274).  Judge Bohm's findings and conclusions found Balke not credible and adopted Carmichael's proposed evidence and arguments that the bankruptcy estate had two MST units and that Balke had violated the stay by failing to turn over one of those units and other parts.  (Docket Entry Nos. 242, 274).  Judge Bohm adopted Carmichael's expert's testimony that to build a new MST unit to replace the one Balke allegedly retained would cost $1,073,656, and to refurbish the unit Balke returned in a "cannibalized" form would cost $884,156.  Judge Bohm fixed that amount as the damages caused by Balke's stay violation.  (Docket Entry No. 242 at 71–77).  Judge Bohm's 2018 judgment directed Balke to: (i) turn over the two MST units to Carmichael and (ii) pay the damages under 11 U.S.C. § 362(k). (Docket Entry No. 275 at 2–3).  The 2018 judgment awarded Carmichael: (1) $1,957,812.00 in actual damages; (2) $275,880.06 in attorneys' fees; (3) $50,794.96 in costs; (4) a declaration that Carmichael owned the property on which this suit centers; and (5) an injunction directing Balke to turn over all property that Carmichael owned. (Docket Entry No. 275 at 2–3).

In February 2018, Balke moved under Federal Rule of Civil Procedure 59, asserting manifest errors of fact and law in the 2018 judgment.  (Docket Entry No. 282).  Judge Bohm dismissed Balke's Rule 59 motion, concluding that Balke had failed to comply with the local rules governing pleadings.  (Docket Entry No. 286).  Balke appealed Judge Bohm's findings and conclusions, the corresponding judgment, evidentiary rulings, and the dismissal of the Rule 59 motion.  Judge Bohm retired in August 2019 and Judge Isgur inherited the case.

In January 2020, Balke asked this court to remand the case for Judge Isgur to consider the Rule 59 motion on the merits. This court remanded the case in June 2020 for Judge Isgur to consider the Rule 59 motion.

After a five-day trial, at which testimony and evidence was presented, Judge Isgur issued a Memorandum Opinion ruling on Balke's Rule 59 motion. (Docket Entry No. 692). Judge Isgur primarily relied on evidence from witnesses with personal knowledge of the contested issues. Judge Isgur heard testimony from Ryan Boulware, an Imperial Petroleum employee who did not testify during the trial before Judge Bohm. (Docket Entry No. 693 at 10). Judge Isgur determined that the 2018 judgment's damages award was based on manifest errors of fact about the existence of a second MST 1000 unit, the spare parts that were returned, and the value of the MST 1000 unit that was provided to Carmichael. (Docket Entry No. 693 at 10, 16, 22). Judge Isgur declined to vacate the finding that Balke had intentionally violated the stay by disassembling one unit. (Docket Entry No. 693 at 20). Judge Isgur concluded that Imperial had owned one demonstration MST 1000 Unit, the Demo Unit, and one MST 150 Unit before the bankruptcy. (Docket Entry No. 693 at 9). The Demo Unit was provided to Balke before the Memorandum of Understanding was executed in September 2011. (Docket Entry No. 693 at 11). The MST 150 Unit was in Brazil from 2010 to May 2012, then returned to the United States, where it was "parted out and used to reconfigure" the Demo Unit. (Docket Entry No. 693 at 9). The Brazil Unit was never operational after it was returned to the United States in May 2012. (Docket Entry No. 693 at 11).

When the trustee assigned Imperial's property to Carmichael in 2014, Imperial owned the Demo Unit, the remaining components of the Brazil MST 150 Unit, and some MST component parts. (Docket Entry No. 693 at 12). Balke had never fulfilled his responsibilities under the Memorandum of Understanding and did not have two fully operational and refurbished MST 1000

6

units to turn over to Carmichael. Before the entry of the 2018 judgment, Balke had returned the Demo Unit, although partially disassembled, and the remaining MST component parts to Carmichael. Judge Isgur explained that Judge Bohm's factual error that Balke had—and failed to turn over—a second refurbished, functional MST 1000 unit was based on Judge Bohm's incorrect assumption that at the time of the assignment of Imperial's property in 2014, Balke had completed the refurbishment of two MST 1000s, as contemplated by the Memorandum of Understanding. (Docket Entry No. 693 at 10). Judge Isgur concluded that the facts in the record showed that Balke had only one MST 1000 unit to be returned, and that it was returned (although disassembled). (Docket Entry No. 693 at 12).

Soon after Judge Isgur issued the March 2021 Memorandum Opinion, Carmichael filed a Notice of Appeal. *Balke v. Carmichael*, No. 18-00731 (S.D. Tex. Mar. 16, 2021), Docket Entry No. 68. Balke asked this court to remand to the bankruptcy court with instructions to enter a new judgment based on the March 11 Memorandum Opinion. *Balke v. Carmichael*, No. 18-00731 (S.D. Tex. Mar. 19, 2021), Docket Entry No. 73 at 1–4. This court granted Balke's request to remand for the bankruptcy court to "determine whether its March 11, 2021, [M]emorandum [O]pinion requires vacatur or modification of [the] 2018 final judgment." *Balke v. Carmichael*, No. 18-00731 (S.D. Tex. Mar. 29, 2021), Docket Entry No. 75 at 1–2. The court dismissed Carmichael's appeal pending Judge Isgur's ruling.

On remand, Judge Isgur asked the parties to brief the effect of the March 2021 Memorandum Opinion on the 2018 judgment, and to specifically address the attorney's fees award. Judge Isgur then issued an opinion finding that modification of the prior judgment's damages and fee award was necessary and appropriate under Rule 59. Judge Isgur also found that because Balke had returned the Carmichael's property before the 2018 judgment was entered, the injunction and

declaratory relief issued as part of that judgment ordering Balke to return property had to be vacated. (Docket Entry No. 719).

The parties cross appealed.

Both bankruptcy judges heard evidence over multiple days, but made different credibility determinations and came to different factual conclusions about the second MST 1000 unit, the value of the returned Demo Unit, and Balke's failure to return other component parts. This court's review of the record shows that Judge Isgur's ruling was amply supported by the evidence, including testimony by witnesses with personal knowledge that Judge Bohm did not consider. Neither side raises a basis to reverse Judge Isgur's modification of the prior judgment damages and fee award or to reverse the order vacating injunctive relief. The appeals are dismissed.

## II.    The Legal Standard

This court has jurisdiction over a bankruptcy court's final order under 28 U.S.C. § 158(a)(1). "Traditional appellate standards" apply to a district court's review of a bankruptcy court's order under 28 U.S.C. § 158(a). *Stern v. Marshall*, 564 U.S. 462, 475 (2011). District courts review the bankruptcy court's conclusions of law de novo and its findings of fact for clear error. *See In re Ahern Enters., Inc.*, 507 F.3d 817, 820 (5th Cir. 2007); *In re Barron*, 325 F.3d 690, 692 (5th Cir. 2003); *In re Perry*, 345 F.3d 303, 309 (5th Cir. 2003). "A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed." *In re Acis Cap. Mgmt., L.P.*, 604 B.R. 484, 506 (N.D. Tex. 2019) (quoting *In re Johnson Sw., Inc.*, 205 B.R. 823, 827 (N.D. Tex. 1997)). The court reviews a bankruptcy court's evidentiary rulings for abuse of discretion. *In re SGSM Acquisition Co., LLC*, 439 F.3d 233, 239 (5th Cir. 2006).

Under Federal Rule of Civil Procedure 59(a)(2), "the court may, on motion for a new trial, open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new ones, and direct the entry of a new judgment." FED. R. CIV. P. 59(a)(2). Motions under Rule 59(e) are "properly invoked 'to correct manifest errors of law or fact or to present newly discovered evidence.'" *In re Transtexas Gas Corp.*, 303 F.3d 571, 581 (5th Cir. 2002) (quoting *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 473 (5th Cir. 1989)).  A Rule 59 motion does not need to demonstrate earlier diligence in obtaining the newly offered evidence. *Ford v. Elsbury*, 32 F.3d 931, 937 (5th Cir. 1994) (noting that the motion to reurge under Rule 59(e) need not show earlier diligence like a Rule 60(b) motion (citing *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 174 (5th Cir. 1990)).

When a successor judge replaces another judge, "[t]he successor judge has the same discretion as the first judge to reconsider [the first judge's] order."  *Stoffels ex rel. SBC Tel. Concession Plan v. SBC Commc'ns*, Inc., 677 F.3d 720, 728 (5th Cir. 2012) (quoting *Abshire v. Seacoast Products*, Inc., 668 F.2d 832, 837–38 (5th Cir. 1982)).  "In exercising this discretion, successor judges should, in accordance with values of comity and predictability, carefully and respectfully consider the conclusions of prior judges before deciding to overturn them." *Id.* (citing 18B Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure* § 4478.4 (2002)).  Law of the case is "a flexible doctrine," allowing for "[a] judge convinced that an earlier ruling was wrong has, must have, authority to reconsider and rectify the error." *Id.* (citing 18B Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 4478.4 (2002)).  *Cf. Henry A. Knott Co., Div. of Knott Indus. v. Chesapeake & Potomac Tel. Co. of W. Virginia*, 772 F.2d 78, 85 (4th Cir. 1985) (when a new special master was appointed to a case, "[a] hearing *de novo* before a new successor master or

9

before the district court must be conducted if the case requires the trier of fact to make credibility determinations concerning the testimony of witnesses").

## III.    Analysis

### A.    The Bankruptcy Court's Jurisdiction to Modify the Original Judgment

Carmichael argues that the bankruptcy court had jurisdiction only to review the motion to vacate the order of dismissal of the Rule 59 motion, which was dismissed because of a procedural defect, and not to decide the Rule 59 motion on the merits.

When a bankruptcy court lacks jurisdiction to decide issues that arise after the filing of an appeal to the district court, Federal Rule of Bankruptcy Procedure 8008 allows the district court to remand for further proceedings. Remand is proper if the bankruptcy court has stated that it would grant the motion on appeal or that the motion "raises a substantial issue." Fed. R. Bankr. P. 8008(a)(3). Rule 8008 states:

> **(a) Relief pending appeal.** If a party files a timely motion in the bankruptcy court for relief that the court lacks authority to grant because of an appeal that has been docketed and is pending, the bankruptcy court may:
> > **(1)** defer considering the motion;
> > **(2)** deny the motion; or
> > **(3)** state that the court would grant the motion if the court where the appeal is pending remands for that purpose, or state that the motion raises a substantial issue.
> **(b) Notice to the court where the appeal is pending.** The movant must promptly notify the clerk of the court where the appeal is pending if the bankruptcy court states that it would grant the motion or that the motion raises a substantial issue.
> **(c) Remand after an indicative ruling.** If the bankruptcy court states that it would grant the motion or that the motion raises a substantial issue, the district court or BAP may remand for further proceedings, but it retains jurisdiction unless it expressly dismisses the appeal. If the district court or BAP remands but retains jurisdiction, the parties must promptly notify the clerk of that court when the bankruptcy court has decided the motion on remand.

Fed. R. Bankr. P. 8008. This court previously concluded that Judge Isgur had made an indicative ruling and remanded the case to be considered on the merits. *Balke v. Carmichael*, No. 4:18-CV-

00731, 2020 WL 10897509, at *6 (S.D. Tex. June 24, 2020).  Judge Isgur explained that "there is a substantial issue as to whether [the denial of the Rule 59 motion] is correct."  *Id.*  He stated: "[W]hat I think I intend to do . . . is to recommend on my own motion to the District Court that it promptly remand back to this Court for a hearing on that motion that was potentially improperly denied[.]"  *Id.*  This court explained that Judge Isgur's observation that the motion raises a "substantial issue" implicated Bankruptcy Rule 8008(a)(3).  *Id.*  Judge Isgur's statements on the record were indicative rulings under Bankruptcy Rule 8008(a)(3).  This court had authority to remand under Rule 8008(c).  The remand order instructed the bankruptcy court to consider not only the procedural issue raised by the denial of the Rule 59 motion, but also to consider the motion on the merits.  *Id.* at *7.   In considering the Rule 59 motion, Judge Isgur was not limited to the errors alleged in the motion.  Wright and Miller, 11 *Fed. Prac. & Proc. Civ.* 2817 (3d ed. 2021).

Judge Isgur explained that he believed the Rule 59 motion raised a substantial issue on the merits, not limited to the procedural denial.  The court agrees with its earlier conclusion that Judge Isgur's indicative ruling applied to both the order dismissing the Rule 59 motion and the merits of the Rule 59 motion, and the remand was for the bankruptcy court to consider both.  The bankruptcy court had jurisdiction to make the rulings it did, and this court has jurisdiction over the appeals from those rulings.

### B.    What Balke Had and Returned

Carmichael raises several challenges to Judge Isgur's findings and damages calculation. The central debate is whether the properly admitted evidence supports Judge Isgur's conclusion that Balke owed Carmichael only the one MST 1000 unit and the component parts that Balke has already turned over.  Carmichael argues that Judge Isgur improperly relitigated the same issues

that Judge Bohm addressed, and that no properly admitted new evidence supported Judge Isgur's conclusions.  These arguments fail for several reasons.

### 1.    The Brazil Unit

Carmichael argues that Judge Isgur's conclusion that a second operational MST Unit did not exist was clearly erroneous and a relitigation of the issues before Judge Bohm.  The record is unclear as to whether the Brazil Unit was operational when it was returned from Brazil. (ROA.0002445; ROA. 2688–89).  Springer testified that the Brazil Unit was fully operational when it was in Brazil, but it had to be disassembled to be shipped back to the United States and it was "never used nor evaluated" after it arrived in the United States.  (ROA.0002688–89).

Balke testified that he kept some equipment parts from the Brazil Unit that Springer had given to him.  ROA.0001605.  The Brazil Unit had an updated MST 1000 applicator, but all of the other parts from the Brazil Unit were too small to be used in an MST 1000 unit.  (ROA.0024575; ROA.0024783; ROA.0035697–35703).  The record showed that Balke used some parts of the Brazil Unit to reconfigure the Demo Unit; that Balke had sold off other parts before the bankruptcy; and that Balke had thrown away some other parts from the Brazil Unit before the bankruptcy. (ROA.002650–51; ROA.24835–37; ROA.0035697; ROA.35702).

Even if evidence showed that the Brazil Unit was functional when it left Brazil, this does not show that the Brazil Unit had been upgraded to an operational MST 1000 unit when the bankruptcy trustee assigned the equipment to Carmichael.  Balke pointed to evidence that the Brazil Unit had been broken down into parts before the trustee assigned the equipment to Carmichael.  Balke also pointed to evidence that the Brazil Unit was never a functional MST 1000 unit because even with an MST 1000 applicator, the other parts were too small.

Judge Isgur credited Springer's testimony that the Brazil Unit was never operational when it was shipped back to the United States, and that it had not been refurbished as a functional MST 1000 unit when the trustee assigned the equipment to Carmichael.  (Docket Entry No. 693 at 12). Balke testified, and Judge Isgur credited, that Springer had given Balke some component parts, including the microwave applicator, which could not be used in an MST 1000 unit. (ROA.0001605).  Carmichael has not shown that Judge Isgur's conclusion was a manifest error because the evidence that Carmichael points to shows only that Imperial had other component parts from the Brazil Unit before the assignment, and does not show that Imperial had a second functional MST 1000 unit covered by the assignment.  To the extent that Carmichael is asking this court to discredit the testimony Balke and others at Basic and Imperial gave about the equipment, including the equipment Springer gave Balke, there is no adequate record basis to do so.

### 2.    The Demo Unit

Judge Isgur agreed with Judge Bohm that Imperial had one complete MST 1000 unit, the Demo Unit, which was returned to Carmichael in August 2014 "albeit partially disassembled." (Docket Entry No. 693 at 12).  Before its refurbishment in September 2012, this unit had been stored at Imperial's facility for "five or six years," and consisted of an MST 1000 with a skid, pumps, motors, an applicator, wave guide, control panel, and microwave transmitter.  (Docket Entry No. 693 at 11).  Basic (Balke) received the parts before the MOU was executed in September 2011, and the unit was a functional demonstration unit in 2012.  (ROA.036969; ROA.24836–37; ROA.31375 at 16–20).  Springer testified that the key components were 12 to 14 years old, and that "it was operational for a one- or a two- or a three-hour demo, but nothing more than that." (ROA.0024583).

Judge Isgur accepted Judge Bohm's conclusion that that Balke willfully violated the stay by disassembling the Demo Unit, but he rejected Judge Bohm's damages calculation.  The court affirms Judge Isgur's conclusion that Imperial had one complete MST 1000 unit, the Demo Unit, that was "partially disassembled" upon return, and addresses the damages issues below.

### 3.        Ryan Boulware's Testimony

Carmichael argues that Judge Isgur erred in admitting Ryan Boulware's testimony from a Rule 2004 examination in November 2013.  Carmichael argues that this was not admissible as newly available evidence because it was given over a year before the claims in the adversary proceeding were brought.  Balke's Rule 59 motion relied on testimony from Kevin Maki and did not address the Boulware testimony.  Boulware's testimony was raised for the first time at the Rule 59 hearing.  Judge Isgur admitted the testimony under Federal Rule of Evidence 807, the residual hearsay exception.  (Docket Entry No. 693 at 10).  Balke did not provide notice of the intent to offer this testimony before the hearing.

"In an appeal based on an evidentiary ruling of the Bankruptcy Court, an appellant must prove both: (1) that the Bankruptcy Court abused its discretion; and (2) that the appellant's substantial rights were prejudiced."  *In re Pequeno*, 223 F. App'x 307, 308 (5th Cir. 2007).  "A ruling has affected the substantial rights of the party if, when considering all of the evidence presented at trial, the ruling had a substantial effect on the outcome of the trial."  *U.S. Bank Nat. Ass'n v. Verizon Commc'ns, Inc.*, 761 F.3d 409, 430 (5th Cir. 2014), *as revised* (Sept. 2, 2014).  If the error was harmless, it will be excused.  *See United States v. Hart,* 295 F.3d 451, 454 (5th Cir. 2002).

Carmichael has not shown that Judge Isgur abused his discretion in admitting Boulware's testimony under the residual hearsay exception.  The testimony would also have been properly

admitted under Federal Rule of Evidence 804(b)(1).  Even if Boulware's testimony should not have been admitted as new evidence, Carmichael has not, and cannot, show unfair prejudice by its admission.  Judge Isgur relied on Boulware's testimony as "confirmation" of what Judge Bohm had already concluded—that by September 2012, one of the MST 1000 units had been refurbished and was operational for testing in December 2012. (Docket Entry No. 693 at 10; Docket Entry No. 242 at 16).  Judge Isgur also relied on Boulware's testimony to "buttress" Balke's testimony that Basic had only one functional MST Unit as of November 2013.  (Docket Entry No. 693 at 17).  In short, Boulware's testimony was cumulative of, and relevant only because it was consistent with, other testimony that was itself sufficient to justify the trial outcome.

Carmichael argues that Judge Isgur erred in assessing whether Boulware's testimony would be probative under *Luig v. N. Bay Enterprises, Inc.*, 817 F.3d 901 (5th Cir. 2016).  *Luig* involved a district court judge who failed to consider newly presented evidence and denied a motion for reconsideration.  *Id.* at 906.  *Luig* does not help Carmichael because Judge Isgur did consider the new evidence, and the record shows no unfairly prejudicial impact on Carmichael's substantial rights.

### 4.     Alan Springer's Testimony

Carmichael argues that Judge Isgur should not have admitted Springer's testimony from the main bankruptcy proceeding without an opportunity to object to specific portions.  Carmichael also argues that Judge Isgur violated the law of the case doctrine by admitting transcripts from the February 2014 hearing and the April 3 meeting, which Judge Bohm had excluded.  But Carmichael again has not shown that Judge Isgur relied on Springer's testimony in a way that had a substantial effect on the outcome of the trial or prejudicially impacted Carmichael's substantial rights.  *See U.S. Bank Nat. Ass'n*, 761 F.3d at 430.

Carmichael argues that Springer's statements should not have been admitted under *In Matter of Galaz* because the stay violation claims are brought in Carmichael's capacity as a creditor, not assignee, and *Galaz* involved an assignee's inheritance of the assignor's prior positions. 841 F.3d 316, 326 (5th Cir. 2016). In *Galaz*, the Fifth Circuit affirmed the bankruptcy court's decision to take "judicial notice of all the filings in the bankruptcy case, the adversary proceedings, the filings and decisions in the appeals of the bankruptcy case, and the decisions in the [related] state court litigation" and "noted several instances where [the assignor] asserted [a contrary position]" regarding the ownership interest at issue. *Id.* at 326. Carmichael's own pleadings allege that Carmichael is the "successor-in-interest" to Imperial, "inherit[s] the positions that [Imperial] has taken throughout the litigation," and that Springer was Imperial's CEO. *See id.*; (Docket Entry No. 620-16). There is no basis for reversal in the admission of Springer's testimony.

### C.    Damages

Judge Isgur concluded that Imperial had one refurbished MST 1000 unit in September 2012, the Demo Unit that Balke returned. (Docket Entry No. 693 at 11). Imperial did not have two operational MST 1000 units during the bankruptcy. As a result, Carmichael was not entitled to damages for the cost of building a new MST unit to replace a nonexistent missing MST unit. Judge Isgur concluded that it was error to award $1,073,656 in damages, which the 2018 judgment included as the cost of building a new or refurbished operational MST 1000 unit.

The Demo Unit was returned to Carmichael, but it was disassembled. (Docket Entry No. 684 at 106). Judge Isgur explained that Carmichael was entitled to the costs to reassemble the Demo Unit, which was a mix of new and used parts, but was not entitled to the cost of building a new or refurbished operational MST 1000 unit.

Carmichael argues that Judge Isgur erred in assuming that the prior award was based on repairing or rebuilding the Demo Unit with new parts.  Carmichael points to the testimony of the expert Carmichael designated, Tim Cole.  He estimated that the repair or refurbishment would cost $884,156.00 using salvaged parts.  (ROA.3626).  Cole testified that he inspected and reviewed pictures of the remains of the MST units returned to Carmichael and used this information to prepare his cost evaluation.  (ROA.0003517–22).  He based his estimates on the equipment or parts that could be salvaged from the disassembled MST units.  Cole explained that the salvaged equipment had to be repaired, tested, and certified before it could be used in a refurbished MST-1000 unit.  (ROA.003620–40).  Carmichael argues that the repair was more complicated than simply reassembling the existing parts.  The wires to the control panel, electrical feed, instruments, transmitters, and values were all cut, requiring the entire skid to be rewired and tested. (ROA.003620–40).

Balke explains that there was no agreement to refurbish the Demo Unit to the specifications of a custom-built unit, such as the model Cole relied on in making his estimate.  Balke points to Basic's proof of claim in the bankruptcy court, seeking $67,398.56 as "money spent refurbishing [Imperial's] MST Units," arguing that "refurbishing" as Basic used the term clearly meant something different from the way Cole used the term.  Cole estimated that it would cost $884,156.00 to "refurbish" the Demo Unit.  (ROA.0003626).  Cole used the specifications from an earlier project used by unrelated parties and in unrelated places—the ESSO/Chad Unit—and calculated the cost of building two new units up to the ESSO/Chad Unit specifications, using the skid and three parts from the Demo Unit.  Cole testified that the new units would have upgraded safety equipment to ensure that they could be brought "online" now.  (ROA.0003787).  But Imperial never had a Demo Unit that was upgraded to the quality of the ESSO/Chad Unit, with

new parts.  Cole's expert testimony was based on the cost of building two new ESSO/Chad units in 2015 dollars, using some parts from the Demo Unit.  Because the Demo Unit, as it existed on July 15, 2014, was different from, and not of the new or improved quality of, the ESSO/Chad Unit, Cole's testimony is not based on relevant facts.  Carmichael has not shown that Judge Isgur erred in not relying on, or discounting, Cole's testimony.

After violating the stay, Balke had "an obligation to restore the status quo by undoing [the] previous action and preventing the continuation of the consequences of the stay violation."  *Com. Credit Corp. v. Reed*, 154 B.R. 471, 476 (E.D. Tex. 1993) (citing *In re Wariner*, 16 B.R. 216, 218 (Bankr. N.D. Tex. 1981)).  When the Demo Unit last operated, in June 2013, it was made up of parts from the Brazil Unit and other parts supplied by Imperial Petroleum that were 12 to 14 years old.  Docket Entry No. 669-5 at 43:3.  Balke testified that it would take "two men one day" or "between 8 and 10 hours," to complete the repair of the Demo Unit.  Relying on this testimony, Judge Isgur calculated the repair costs to be $4000.00.  (Docket Entry No. 670 at 60).  Balke offered to do the reassembly without charge.  Carmichael could, and did, decline that offer.  Carmichael had the burden of proving damages.  Carmichael did not submit evidence as to the cost of reassembling the Demo Unit, as opposed to the cost of building better and newer units.  Judge Isgur did not err in relying on Balke's testimony as to damages.

### D.  Injunctive Relief

Carmichael argues that Judge Isgur improperly relitigated the evidence supporting the injunctive relief requiring an x-shaped wave guide to be returned.  Judge Bohm had concluded that the x-shaped wave guide had not been returned to Carmichael and that an injunction was proper to instruct Balke to return it and other property. (Docket Entry No. 242 at 21; Docket Entry No. 275).  Judge Isgur concluded that Balke credibly testified that neither the Demo Unit nor the Brazil

Unit was equipped with an x-shaped wave guide. (Docket Entry No. 693 at 13). Basic had manufactured a wave guide for the ESSO/Chad Unit, which was not part of Imperial's estate. Judge Bohm relied on the testimony of Gary Emmott, who testified that on August 1, 2014, he saw an x-shaped wave guide on Balke's property. (ROA.3985). It was within Judge Isgur's discretion to give limited credit to Emmott's testimony. Judge Isgur noted that Emmott based his conclusion that he saw the x-shaped wave guide in part on photographs of the Demo Unit's wave guide, which was not an x-shaped wave guide, suggesting that Emmott did not know what an x-shaped wave guide looked like. (Docket Entry No. 693 at 13 n.23). Emmott did not go to Balke's property during the bankruptcy proceedings. (Docket Entry No. 693 at 13 n.23). Even if Emmott had seen an x-shaped wave guide in August 2014, this was after the automatic stay had been lifted. If the x-shaped wave guide was later removed from the property, this would not have violated the stay.

### E.    Declaratory Relief

Carmichael asks this court to reinstate the findings from the original judgment that any transfer by Balke of any of the property transferred to Ultratec is null and void. Carmichael argues that the amended judgment improperly denies declaratory relief against Ultratec.

Judge Isgur concluded that all property was returned to Carmichael and found no evidence that any of Imperial's property was transferred to Ultratec. (Docket Entry No. 218 at 19). Carmichael has not shown that Judge Isgur's conclusion that all property was returned to them was erroneous, or that Ultratec received any property. Carmichael has not shown there is a basis to include declaratory relief.

## IV.    The Cross-Appeal

Balke argues that the $4,000.00 damage award should be set aside because Carmichael did not prove that there was an intentional violation of the automatic stay that caused damages.

19

Carmichael must show a violation that occurred before the stay expired on July 15, 2014. Balke argues that Judge Isgur identified only the chiller as having been removed from the Demo Unit as a violation of the stay occurring before July 2014. Otherwise, Balke argues, there is no evidence that the Demo Unit was dismantled before July 15, 2014, and the photographs from August 2014 show that the Unit was still intact. Balke also argues that the Demo Unit had to be disassembled for transport to Carmichael, which precludes any damages to Carmichael by the disassembly of the chiller. Balke explains that any claim for interfering after July 15, 2014, would be a violation of the sale order, not a violation of the stay, which must be brought as a motion for contempt, and Carmichael has repeatedly argued that he was only bringing a claim for a violation of the stay. Balke additionally argues that there is no evidence showing the cost of adding the chiller back to the skid.

Balke testified that he took equipment from the Brazil Unit, which he believed had been given to him by Springer, and moved it onto Basic's property, including by mounting some of it onto one of Basic's skids. (ROA.0005124–27). Renee Balke testified that the work for the Ultratec MST project must have been completed by July 11, 2014, based on the job cost detail report prepared by Basic's accounting department. (ROA.0001080). Carmichael argues that this shows that Imperial's equipment must have been taken from the Brazil Unit before that date. Carmichael also points to the pictures, emails, and shipping invoices which show that the chiller, wave transmitter, and wave guide were still installed on the MST unit in Basic's shop when the first shipment of the MST-1000 skid was sent to them. (ROA.0003985–86; ROA.0032111–14; ROA.0032250–55). Carmichael argues that the record shows that Basic (Balke) shipped the chiller in August 2014 only after Emmott emailed Balke to complain that some of the MST equipment was missing.

Judge Isgur concluded that although there was no direct evidence that Balke wrongfully dismantled the Demo Unit, Judge Bohm had resolved a factual dispute based on circumstantial evidence, and that this was not properly reconsidered at the Rule 59 stage.  The court agrees and will not disturb the conclusion that Balke committed a willful violation of the stay by removing the chiller.

## V.     Attorney's Fees

Balke cites *In re Martinez* to argue that the court need not award fees when, as here, the actual damages are small. 281 B.R. 883, 886 (Bankr. W.D. Tex. 2002).   But *In re Martinez* involved a finding of a "no harm" stay violation, and here, both Judge Isgur and Judge Bohm concluded that Balke did violate the stay and that damages resulted, although in drastically different amounts.

Balke also argues that Carmichael did not meet their burden of segregating between the claims that support a fee award and the claims that do not.[4]   Balke argues that Carmichael's counsel did not separate time entries based on the claims, so it is impossible to determine what fees are recoverable.

Carmichael has the burden of submitting evidence that segregates the hours worked between claims which support a fee award and claims that do not.  *Tow v. Speer*, No. CV H-11-3700, 2015 WL 12765414, at *6 (S.D. Tex. Aug. 17, 2015) (citing *Navigant Consulting, Inc. v. Wilkinson,* 508 F.3d 277, 298 (5th Cir. 2007)).   They failed to do so, but that does not end the inquiry.  "The proper remedy for omitting evidence of billing judgment does not include a denial

---

[4]  Carmichael's argument that Balke's challenge to the fee award based on failure to segregate or mitigate was waived is without merit.  Balke included the issue of whether Carmichael had "carried their burden to prove expenses and cost awarded were reasonable or necessary, and/or related to the stay violation, if any is ultimately found."  That was sufficient to raise the issue.

of fees but, rather, a reduction of the award by a percentage intended to substitute for the exercise of billing judgment." *Saizan v. Delta Concrete Prod. Co.*, 448 F.3d 795, 799 (5th Cir. 2006).

Judge Bohm accounted for the impermissible intermingling by reducing the requested fees from $461,522.06 to $275,880.06. (Docket Entry No. 275). Judge Isgur reduced Judge Bohm's fee award from $275,880.08 to $40,968.19 based on his revised calculation of actual damages. (Docket Entry No. 718). Both bankruptcy judges used the lodestar method to determine the reasonable fee award for Carmichael's prosecution of the § 362(k) claim. Judge Isgur did not impose a strict proportionality requirement, but he did consider the lower degree of success in determining what fee amount was reasonable and fair. (Docket Entry No. 718 at 11). Judge Isgur noted that when Judge Bohm awarded fees of $275,880.06, that was 14.1% of the original damages award and "certainly in line with the percentages of fees awarded in other successful [§ 362(k)] suits." (Docket Entry No. 716 at 10). When the damages award was reduced from $1.9 million to $4,000—less than one half of 1% of the damages Carmichael sought—that resulted in a fee award more than 70 times greater than the damages awarded. This gross disparity made the attorneys' fees disproportionate. (Docket Entry No. 718 at 14). Judge Isgur emphasized that proportionality should be considered in awarding attorneys' fees, although it is not the only or the determinative factor. (Docket Entry No. 718 at 9, 14); *Northwinds Abatement, Inc. v. Employers Ins. of Wausau*, 258 F.3d 345, 353–55 (5th Cir. 2001). Judge Isgur aptly summarized the work Carmichael's attorneys had done:

> Essentially, [they] conducted discovery, and presented evidence to support a claim for relief that could not be granted because the property with which [Balke] allegedly interfered did not exist. If Carmichael could segregate their attorneys' fees incurred in pursuit of relief related to the non-existent MST 1000 unit (i.e., viewing it as a separate claim), Carmichael could not recover those fees. . . . . But those fees cannot be segregated based on based on [the Carmichael's lawyers'] time records.

(Docket Entry No. 718 at 15).  The intermingling requires a court to consider the overall success of the litigation in determining the appropriate fee award.  And where the actual damages have been reduced by a factor of 70, it is appropriate to reevaluate the impact of the party's success on the fee calculation.

Carmichael was initially awarded $1,957,812.00 in actual damages.  That included $1,073,656.00 for Balke's alleged interference with a nonexistent MST 1000 unit.  This portion of the award amounts to roughly 55% of the total damages Carmichael sought.  Judge Isgur had ample support for reducing Carmichael's fee award by a commensurate 55% to reflect the lack of success in prosecuting this part of the claim.  That reduction would have left $124,146.03 in attorneys' fees, still disproportionate to the $4,000 in damages awarded for the interference with the existing Demo MST 1000 Unit.

Judge Isgur approached the reasonableness issue in terms of whether Carmichael's counsel was reasonable in spending more than 1500 hours on this case. (ECF No. 274 at 5–6).  This was a stay violation case.  Judge Isgur reviewed a number of stay violations cases and noted that counsel often expend less than 100 hours prosecting § 362(k) claims.  (Docket Entry No. 718 at 16). Instead, Carmichael's lawyers spent over 1,500 hours as of August 2021, a year and one appeal ago.  They spent what must be hundreds of additional hours after Judge Isgur made clear that $1.07 million of the damages award was based on a nonexistent unit and reduced actual damages from $884,156 to $4,000 for the disassembly of the Demo Unit.  Judge Isgur found that the hours Carmichael's counsel expended to achieve limited success, and the size of the prior fee award (even after a 55% reduction) make the fee much higher than fee awards in cases with larger damages awards.

Judge Isgur appropriately considered Carmichael's success in relation to the fees requested, as well as fee awards in similar cases, as required by *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714, 718 (5th Cir. 1974) and the lodestar analysis.  He concluded that an additional 67% reduction to the prior fee award is appropriate—resulting in a fee award of $40,968.19.  This amounted to about 135 hours billed at $300 per hour, which is far closer to the number of hours in other stay violation cases, and brings the relationship between the damages and fees awards into closer alignment with the proportions between fee awards and damages in similar cases (the fee award is about 10 times greater than the actual damages award).  Judge Isgur noted that the aggregate reduction of the fee award (about 85% from the prior fee award) tracks fee award reductions based on similarly limited successes*.  See Saldivar v. Austin Indep. Sch. Dist.*, 675 F. App'x 429, 432 (5th Cir. 2017) (affirming an 82% lodestar reduction when the requested attorneys' fee award was 79 times greater than the damages award).

Judge Isgur properly reduced the fee award to account for the relatively limited success Carmichael achieved in the pursuit of the claims against Balke.  This court affirms Judge Isgur's careful analysis of the attorneys' fee award in relation to the substantially reduced damages award.  Accounting for the correct damages award, Carmichael is entitled to an attorneys' fee award of $40,968.19.

 Balke argues also that the cost award should be revisited because Judge Isgur believed that the cost award was not within the scope of his review under Rule 59.  Judge Isgur explained that Balke characterized the cost award as "excessive" but did not otherwise provide a basis to reconsider the cost award.  (Docket Entry No. 718 at 17).  The same is true of the cross-appeal. The court agrees with Carmichael that Balke has not provided a basis to revisit the cost award.

**VI.    Conclusion**

The cross-appeals are denied.  The Memorandum Opinion and amended judgment entered on August 18, 2021, are affirmed.  This case is dismissed.

SIGNED on July 18, 2022, at Houston, Texas.

Lee H. Rosenthal
Chief United States District Judge